PD-1389-14

No. 01-13-00208-CR

In The Court Of Criminal Appeals Of
Texas

Jason Lee Reed,
Petitioner

V.

The State Of Texas,
Respondent

Petition in Cause No. 1266357
from the 338th Judicial District
Court of Harris County, Texas and

The Court of Appeals for the
First District of Texas

Petition For Discretionary Review

RECEIVED IN
COURT OF CRIMINAL APPEALS

AUG 05 2015

Abel Acosta, Clerk

# Table Of Contents

Index Of Authorities .... I, II, III

Statement Regarding Oral Argument ....1

Statement Of The Case ....1

Statement Of Procedural History ....2

Reason For Review ....3

Statement Of Facts ....4

Ground For Review One ....12

The evidence presented at the hearing on the State's Motion to Adjudicate Guilt was legally insufficient to support a rejection of the Petitioner's self-defense claim. The trial courts revocation of the Petitioners community supervision was therefore an abuse of discretion.

Ground For Review Two ....12

Since the conclusion of the hearing on the States Motion to Adjudicate Guilt, material evidence favorable to Mr. Reed has been discovered. Put succinctly, the incident which led to the revocation of Mr. Reed's community supervision was ultimately dismissed and a new witness —

II

Curtis Whitfield - has been discovered who can confirm that Mr. Reed was acting in self-defense.

Summary      12

Prayer for Relief      14

Certificate Of Service      15

# Index of Authorities

Cases

Alexander v. State, 95 Tex. Crim. 497 (Tex. Crim. App. 1923) ... 3

Burks v. United States, 437 U.S. 1 (1978) ... 4

Burns v. State, 262 S.W. 2d 406 (Tex. Crim. App. 1953) ~~~~

Cleveland v. State, 177 S.W. 3d 374 (Tex. App. — Houston [1st. Dist.] 2005, pet. ref'd

Clinton v. State, 354 S.W. 3d 795 (Tex. Crim. App. 2011)

Duncan v. State, 321 S.W. 3d 53 (Tex. App. — Houston [1st. Dist.] 2010, pet. ref'd

Gilbert v. State, 114 Tex. Crim. 532 (Tex. Crim. App. 1930) ... 3

Gillam v. State, 2013 WL 1628386 (Tex. App. — Dallas April 16, 2013, pet. ref'd) (not designated for publication

Gonzalez v. State, 855 S.W. 2d 692, 694 (Tex. Crim. App. 1993)

Greene v. Massey, 437 U.S. 19 (1978) ... 4

Hacker v. State, 389 S.W. 3d 860 (Tex. Crim. App. 2013) ... 3

Halbert v. State, 881 S.W. 2d 121 (Tex. Crim. App. — Houston [1st. Dist.] 1994, pet. ref'd)

In re Winship, 397 U.S. 358 (1970)

Keester v. State, 74 S.W. 3d 31, 36-37 (Tex. Crim. App. 2002)

Krajcovic v. State, 393 S.W. 3d 282 (Tex. Crim. App. 2013) 3

McCain v. State, 22 S.W. 3d 497 (Tex. Crim. App. 2000)

McCandless v. State, 42 Tex. Crim. 58 (Tex. Crim. App. 1900) ... 3

Mendoza v. State, 349 S.W. 3d 273 (Tex. Crim. App. — Dallas 2011, pet. ref'd)

Morales v. State, 357 S.W. 3d 1 (Tex. Crim. App. 2011) ... 3

Mosby v. State, 482 S.W. 2d 256 (Tex. Crim. App. 1972) ... 3

IV

Mullins v. State, 37 Tex. 337, 339-40 (1872)

Poindexter v. State, 153 S.W. 3d 402 (Tex. Crim. App. 2005)    3

Reyes v. State, 849 S.W. 2d 812, 816 (Tex. Crim. App. 1992)

Salazar v. State, 284 S.W. 3d 874 (Tex. Crim. App. 2009)    3

Saxton v. State, 804 S.W. 2d 910 (Tex. Crim. App. 1991)

Simpson v. State, 886 S.W. 3d 449 (Tex. App. — Houston [1st. Dist.]
    1994, pet. ref'd)

Smith v. State, 965 S.W. 2d 509 (Tex. Crim. App. 1998)

Stansul v. State, 870 S.W. 2d 329 (Tex. App. — Austin 1994,
    pet. dism'd

Upton v. State, 853 S.W. 2d 548 (Tex. Crim. App. 1993)

Wallace v. State, 106 S.W. 3d 103, 108 (Tex. Crim. App. 2003)

Williams v. State, 226 S.W. 3d 611 (Tex. App. — Houston [14th Dist.]
    2007, no pet.)

Zuliani v. State, 97 S.W. 3d 589 (Tex. Crim. App. 2003)


Statutes


Texas Alcoholic Beverage Code      105.03 (West 2013)
Texas Alcoholic Beverage Code      105.04 (West 2013)
Texas Alcoholic Beverage Code      105.05 (West 2013)
Texas Alcoholic Beverage Code      105.06 (West 2013)
Texas Health & Safety Code         481.1031 (West 2013)
Texas Health & Safety Code         481.106 (West 2013)
Texas Penal Code                   1.07 (West 2013)
Texas Penal Code                   1.09 (West 2013)
Texas Penal Code                   9.01 (West 2013)
Texas Penal Code                   9.31 (West 2013)    3

| | | |
|---|---|---|
| Texas Penal Code | § 9.32 (West 2013) | 3 |
| Texas Penal Code | § 22.01 (West 2013) | |
| Texas Penal Code | § 30.02 (West 2013) | 3 |
| Texal Penal Code | § 30.05 (West 2013) | 3 |
| Texas Penal Code | § 49.02 (West 2013) | |

Secondary Sources

Acts 2007, 80th Leg., Ch. 1, 3, Eff. Sept. 1, 2007

43A George E. Dix & John M. Schmolesky, Texas Practice: Criminal Practice and Procedure § 48.69 (3d ed. 2012)

43A George E. Dix & John M. Schmolesky, Texas Practice: Criminal Practice and Procedure § 51.56 (3d ed. 2012)

House Research Organization, Bill Analysis, Tex. H.B. 284, 80th Leg., R.S. (2007)

Texas Code on Criminal Procedure art. 40.001

Texas Rules of Appellate Process 21.3

Texas Rules of Appellate Process 21.4

Texas Rules of Appellate Process 22.4

Texas Code on Criminal Procedure

## Statement Regarding Oral Argument

In the event this petition is granted, the petitioner request oral argument. Argument would assist the court because resolution of the grounds for review depends upon a detailed exploration of the facts of the cases. Further, oral argument would provide this court with an opportunity to question the parties regarding their positions.

## Statement Of The Case

The Harris County District Attorney's Office charged Jason Lee Reed ("Petitioner") by indictment on August 24, 2010, with one count of possession of a controlled substance. Specifically, the Petitioner was alleged to have possessed cocaine weighing more than four grams and less than two-hundred grams, with intent to deliver it. No enhancements were alleged in the indictment. Pursuant to a plea bargain, The Petitioner pled guilty to the charged offense on June 10, 2010, and received four years of community supervision.

On August 31, 2012, the State filed a Motion to Adju-

dicate Guilt, alleging that the Petitioner had violated the terms of his community supervision by committing a new law violation and failing to pay fees and court costs. A hearing on the State's Motion to Adjudicate Guilt was held on March 4, 2013. At the conclusion of the hearing, the trial court adjudicated the Petitioner's guilt and found the Petitioner had committed the offense of aggravated assault while on community supervision, but found the allegations the Petitioner failed to pay fees and court costs to be "not true." The trial court assessed punishment at twelve years confinement in the institution division of the Texas Department of Criminal Justice. A Motion for New Trial was filed on April 3, 2013. No hearing was held on the motion and was denied.

## Statement of Procedural History

The judgment of Petitioner's conviction was entered on March 4, 2013. Petitioner's notice of appeal was timely filed. A Motion for New Trial was filed on April 3, 2013 introducing new evidence. On August 29, 2014, The First District Court of Appeals issued an unpublished opinion by Justices Jennings, Higley, and Sharp affirming Petitioner's conviction.

## Reason For Review

The First Court of Appeals affirmed the conviction in this case despite the overwhelming evidence that Jason Lee Reed acted in self-defense (Texas Penal Codes 9.31, 9.32) as stated in Gilbert v. State, 114 Tex. Crim. 532, 533 (Tex. Crim. App. 1930), (Texas Penal Codes 30.02, 30.05), the Due Process Clause as stated in Cochran's Poindexter v. State, 153 S.W. 3d 402, 405 (Tex. Crim. App. 2005) (citing Jackson v. Virginia, 443 U.S. 307 (1979)), Salazar v. State, 284 S.W. 3d 874, 877 (Tex. Crim. App. 2009), No duty to retreat in Morales v. State, 357 S.W. 3d 1, 5 (Tex. Crim. App. 2011), Krajcovic v. State, 393 S.W. 3d 282, 284 (Tex. Crim. App. 2013), the reasonable appearance of danger in Gilbert v. State, 114 Tex. Crim. 532, 533 (Tex. Crim. App. 1930), there was no provocation from the Petitioner to Matthews as stated in McCandless v. State, 42 Tex. Crim. 58, 63-64 (Tex. Crim. App. 1900), as well as defenses supported by Alexander v. State, 95 Tex. Crim. 497, 499 (Tex. Crim. App. 1923), Mosby v. State, 482 S.W. 2d 256, 258 (Tex. Crim. App. 1972) (citing 1 Wharton's Criminal Evidence § 218 at 448-449 (12th ed. 1955)) (the size, strength, and physical characteristics difference), and finally on the fact that was made in Hacker v. State, 389 S.W. 3d 860, 874 (Texas Crim. App. 2013) stating that to revoke the Petitioners community supervision with all allegations being "not true" on a new law violation the Petitioner should be acquitted and reinstated to community supervision

and an order dismissing the State's Motion to Adjudicate Guilt should be the necessary remedy. (Burks v. United States, 437 U.S. 1, 17-18 (1978); Greene v. Massey, 437 U.S. 19, 24 (1978)).

## Statement Of Facts

Charles Matthews- the complainant in the present case- has been a regular customer at Reed's Lounge for about six to seven years. In the years that he has been patronizing Reed's Lounge, Matthews has developed a reputation with the bar's owner as someone who would continually cause problems by "messing with folks." In the words of Sidney Reed - the namesake of Reed's Lounge, as well as its owner and the Appellant's/Petitioner's father- Matthews was "always talking about hitting somebody, whipping on somebody, and I go and I talk to him and he'll leave or something like that. But I ain't never really put him out for good, you know... He's been asked to leave quite a few times." This sentiment of Matthews posing a continual nuisance at Reed's Lounge was echoed by the Petitioner's wife and co-worker at the bar, Madeline Wright-Reed, who stated that most of Matthews visits to the bar resulted in him "bothering other customers, the guys that work for us," and that he had been asked to leave

multiple times by both the bar owner and herself.

In the early morning hours of August 25, 2012, Matthews was bar hopping with his wife and sister. After leaving a night club at approximately 1:35 to 1:40 a.m., Matthews and his party travelled a short distance to Reed's Lounge. Although Matthews was aware that Reed's Lounge closed at 2:00 a.m. — a fact confirmed by the bar's owner — and saw that the door to the bar was locked upon his arrival, he stood outside the bar's door without knocking or announcing his presence and waited until an unidentified person unlocked the door, although there is no indication that the door was unlocked specifically to allow Matthews entry. The Petitioner's wife was working at Reed's Lounge that evening and placed the time of Matthews's arrival at approximately 2:20 a.m. Matthews then walked into the bar, leaving his sister and wife in the car. From here, accounts begin to differ as to what occurred inside Reed's Lounge that night.

According to Matthews's account, there were several people in the bar when he entered including the Petitioner, his wife Madeline Wright-Reed, a female known as "Taz," another female known as "Big D," and an unidentified male. As soon as Matthews entered, the Appellant/Petitioner asked Matthews why he was coming

into the bar so late. Although Matthews responded to the Petitioner that he was simply there to use the restroom, this differed from the motive that he assigned to the trip in his testimony. Specifically, Matthews testified that his true purpose in going to Reed's Lounge that night was to meet up with his brother, who goes by the nickname of "J," but who was not actually present at the bar once Matthews arrived.

In Matthews's rendition of events, the Petitioner did not take kindly to his need to use the facilities and responded with profanity. After using the restroom, Matthews went outside the bar to smoke a cigar, while his wife and sister went inside. A short time later, Matthews returned inside and was allegedly greeted with a flurry of profanity from the Petitioner. After telling the Petitioner that he needed to calm down, Matthews claimed that the Petitioner began to engage in a fight with "Big D"— one of the other female patrons at the bar — that ended when the Petitioner was slammed on the ground by the female. Matthews recounted that it was at this point the Petitioner approached him, pointed his finger at Matthews, and continued to **hurl** verbal

insults, to which Matthews responded by grabbing the Petitioner by his shirt and throwing him to the floor. In Matthews version of events, the Petitioner responded to being grabbed and thrown by retrieving the pistol behind the bar and used it to shoot Matthews. After being shot, Matthews exited the bar and ran across the street where he met up with his sister and wife. Responding officers confirmed that Matthews was shot by the Petitioner one time in the stomach area. Beyond the bullet wound in Matthews's gut, no evidence was detected at the scene indicating more than one round was fired.

The Petitioner's recollection of the events on that night differed in some significant ways from that of Matthews. After Matthews entered Reed's Lounge, the Petitioner instructed Matthews to leave. The Petitioner confirmed that Matthews had grabbed him by the collar of his shirt and pushed him across the bar's dance floor. However, rather than going behind the bar to grab a pistol immediately after this, the Petitioner went behind the bar to make a telephone call to 911, as well as to protect himself from any further aggression by Matthews. The Petitioner's decision to call the police was motivated in part by his knowledge of Matthews's penchant for

heavy alcohol consumption, his past behavior in the bar, and the fact that it was late at night. It wasn't until the 911 call had been made and Matthews began to aggresively approach the bar, stand on the riser at the bottom of the bar, and reach toward the Petitioner that the Petitioner produced the pistol. Matthews was then shot by the Petitioner when the two were approximately an arm's length away from one another.

In explaining his decision to use deadly force, the Petitioner testified that by going behind the bar to call 911, he left himself with nowhere to retreat in the face of a charging Matthews. When directly asked by defense counsel what made him decide to pull the gun's trigger, the Petitioner replied "I was in immediate danger of my life," and confirmed that after having had time to contemplate the events of that night, he still believed that his life was in danger at the moment he shot Matthews. Part of the fear experienced by the Petitioner stemmed from the medical issues he was experiencing with his right hand at the time. The Petitioner's right hand was broken along the fourth metacarpal, for which surgery had been scheduled to take place two days following the incident. Because of the condition his his hand was in, the Petitioner was unable to fight. The Appellant's/Petitioner's father confirmed that the hand injury would have prevented

the Petitioner from fighting, adding that Matthews held a significant size and strength advantage over the Petitioner. According to the Petitioner's wife, his hand injury prevented the Petitioner from forming a fist. The gun which was used by the Petitioner belonged to either the bar's owner or his wife — the Petitioner's father and mother, respectively — and was kept at the bar purely for purposes of protection. Not every chamber of the revolver held a bullet. Rather, the pistol contained only four to five bullets, including two or three spent rounds which had been shot by the bar's owner during a previous robbery attempt and never removed nor replaced with live rounds. This left only one or two live rounds in the pistol at the time it was used against Matthews.

When police officers arrived at the scene, they identified the pistol used by the Petitioner as a .38 revolver containing five spent cartridges. Officer Timothy Hicks — who had approximately a year's experience as an officer at the time of the events in question — secured the weapon and inspected the cartridges in an attempt to discern how many shots had been fired by the Petitioner by smelling the spent cartridges located in the pistol's chambers. Through his inspection, Officer Hicks surmised that three shots had been fired. Officer Hicks attributed his ability to dis-

cern whether a cartridge had been fired. Officer ~~Hicks~~ "experience and [sic in firearms at the academy, they tell us what to look for and what to smell to tell if it had been recently fired at the time." No further details were provided by Officer Hicks as to his training or the signs he was looking for that allowed him to reach this conclusion.

In addition to securing the pistol, Officer Hicks interviewed the Petitioner at the scene. In his report, Officer Hicks memorialized the Petitioner's statement that "the complainant was trying to jump over the bar at him; so he felt in danger and fear of his life." Officer Hicks opined that he did not believe the Petitioner was in fear for his life, but this conclusion was based on what could generously be called dubious reasoning: "In my experience, being that you have someone, I believe, to be in danger — he was still standing outside. He didn't flee the scene. He didn't run away. He was just standing there. On cross-examination, it became apparent that Officer Hicks was operating under a misunderstanding of the law in regards to self-defense:

[The Defense]: Okay. You said — and I don't want to misquote you in any way — but the reason you didn't believe him was because he

didn't run — talking about the defendant, Mr. Reed. He didn't run.

[Officer Hicks]: Yes, sir.

[The Defense]: Well, do you think he had some duty to run?

[Officer Hicks]: Yes, sir.

[The Defense]: Yes? You thought he had the duty to run?

[Officer Hicks]: Did I believe he had a duty?

[The Defense]: Uh-huh.

[Officer Hicks]: You might want to rephrase. I don't understand that question.

[The Defense]: Well, what you told the Court was that one of the reasons — you actually listed two reasons why you didn't believe him, and one was because he didn't run. He was still there at the scene when you got there, right? You remember saying that?

[Officer Hicks]: Yes, sir.

[The Defense]: You think the fact that he didn't run off and he stayed at the scene and waited for the police to come makes him believable or not believable?

[Officer Hicks]: Not believable.

[The Defense]: Not believable? So, if he had run away and hid from the police, you would be more likely to believe that he was in fear of his life when he shot the gun?

[Officer Hicks]: Sir, either way, yes, sir.

The appellant/Petitioner was subsequently detained at the scene on the theory that he had committed aggravated assault.

## Ground For Review One

The evidence presented at the hearing on the State's Motion to Adjudicate Guilt was legally insufficient to support a rejection of the Petitioner's self-defense claim. The trial court's revocation of the Petitioner's community supervision was therefore an abuse of discretion.

## Ground For Review Two

Since the conclusion of the hearing on the State's Motion to Adjudicate Guilt, material evidence favorable to Mr. Reed has been discovered. Put succinctly, the incident which led to the revocation of Mr. Reed's community supervision was ultimately dismissed and a new witness — Curtis Whitfield — has been discovered who can confirm that Mr. Reed was acting in self-defense.

## Summary Of The Argument

There is no factual dispute as to whether the Petitioner shot Matthews. The only issue contested at the hearing on the State's Motion to Adjudicate Guilt was whether the Petitioner was justified in employing deadly force. Based on the evidence

presented, the trial court's rejection of the Petitioner's self-defense claim was not supported by legally sufficient evidence. The subsequent revocation of the Petitioner's community supervision by the trial court was therefore an abuse of discretion.

By entering Reed's Lounge after he knew that it had closed and after he had been asked to leave, Matthews was trespassing and comitting a criminal act. His assault on the Petitioner upon entry into the closed bar transformed Matthews's actions from a simple trespass into a burglary. Because the Petitioner had every right to be at Reed's Lounge — as it was both his place of employment and his habitation — the statutory presumption that the Petitioner's belief deadly force was immediately necessary is raised. This presumption was not rebutted by the State's evidence.

There can be little doubt that had the Petitioner used less-than-lethal force against Matthews in response to Matthews grabbing at the Petitioner in contemplation of a follow-up attack, the Petitioner's actions would have been justified under section 9.31 of the Penal Code. A more difficult question arises because the Petitioner employed deadly force, however.

Because Matthews threw the Petitioner

against a mirror and threatened to "slide" him by whipping him against the floor - both the mirror and the floor are potential deadly weapons - the Petitioner was justified in using deadly force to protect himself against a further attack by Matthews. Based on the threats and actions of Matthews, it was reasonable for the Petitioner to believe any further attacks would likewise consist of Matthews using a deadly weapon against him. Further, the Petitioner was physically incapable of engaging in a fight with Matthews because of a broken hand. Based on his subjective knowledge of Matthews's criminal history, his own physical limitations, and the immediately preceding acts of violence committed by Matthews, the Petitioner's fear of imminent bodily injury or death at the hands of Matthews was reasonable.

## Prayer

Jason Lee Reed asks this Honorable Court to reverse the trials court's adjudication of guilty and order the dismissal of the States Motion to Adjudicate Guilt.

Respectfully submitted,
Jason Lee Reed

## Certificate Of Service

I certify that a true and correct copy of the foregoing Petition for Discretionary Review has been served, via United States mail to Jamie Felicia, Harris County Assistant District Attorney, 1201 Franklin Street, Suite 600, Houston, Texas 77002-1930 and on the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711 on this the 1st day of December, 2014.

Jason L. Reed
Jason Lee Reed

No. 01-13-00208-CR

Jason Lee Reed #1843497     § Petition in Cause No.
       v.                  § 1266357 From The
                          § 338th Judicial District
State Of Texas            § Court of Harris County,
                          § Texas and The
                          § Court Of Appeals for the
                          § 1st District of Texas

## Motion To Suspend Texas Rules Of Appellate Procedure Rule 9.3 Number Of Copies and Recognize Pro Se Status and Limited Access To Legal Knowledge and Information

To The Court Of Criminal Appeals:

     Comes now, Jason Lee Reed, Petitioner/Relator, pro se in the above styled and numbered cause of action, on the 30th day of July 2015, and files this original Motion To Suspend Texas Rules Of Appellate Procedure Rule 9.3 Number Of Copies and Recognize Pro Se Status and Limited Access To Legal Knowledge and Information, and would show the court the following:

### I.

No Access to copy machine.

Limited Access to Legal Material and Limited Knowledge to Legal Procedure

## III.

P.D.R. was sent to Jamie Felicia, Harris County Assistant District Attorney, 1201 Franklin Street, Ste. 600, Houston, Texas 77002-1930 and the State Prosecuting Attorney, P.O. Box 12405, Austin, Texas 78711 instead of sending the P.D.R. to Abel Acosta, Clerk-Court Of Criminal Appeals of Texas, P.O. Box 12308, Capital Station, Austin, Texas, 78711 on December 1st, 2014 by mistake.

## Prayer for Relief

Wherefore, premises considered, Petitioner, Jason Lee Reed, pro se, respectfully requests that the Court Of Criminal Appeals receives this motion in good faith. Petitioner prays that the Court Of Criminal Appeals, hereby, grants this forthcoming Petition For Discretionary Review.

Respectfully submitted,

By: Jason L. Reed

Jason L. Reed
(petitioner)

cc:file/JLR